JASMINE M. STARR (Cal. Bar No. 259473)
Email: starrja@sec.gov
PETER F. DEL GRECO (Cal. Bar No. 164925)
Email: delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine E. Zoladz, Regional Director
Gary Y. Leung, Associate Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ENG TAING AND TOUZI CAPITAL, LLC, <br><br> Defendants. | Case No. **'24CV2179 CAB VET** <br><br> **COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1.      This civil enforcement action concerns a $115 million securities offering fraud by Defendant Eng Taing ("Taing") and the entity he controls, Defendant Touzi Capital, LLC ("Touzi Capital"). When pitching these investments from 2020 to 2023, defendants led investors to believe their investment funds would either be used to finance debt rehabilitation businesses or crypto asset mining businesses that Taing managed through Touzi Capital.

2.      Although Defendants did use investor funds to engage in these business

ventures, Taing and Touzi Capital commingled investor monies, using funds intended for one Touzi Capital entity to meet the needs of another Touzi Capital entity. This commingling violated representations Defendants made to investors that their funds would be used for the specific business they had invested in.

3. In addition, Touzi Capital and Taing enticed investors with materially false and/or misleading statements about their business operations, claiming their debt rehabilitation offerings were stable and liquid investments similar to high-yield money market funds. In reality, these were risky, illiquid investments that entirely depended on the performance of third-party companies. When these third-party companies defaulted on their obligations to Touzi Capital, Defendants hid this from investors for at least nine months while they continued to offer and sell securities to new and continuing investors.

4. Touzi Capital and Taing similarly misled investors in their crypto-asset mining business by marketing it as an investment that could profitably mine bitcoin at prices far below bitcoin's prevailing market price. They claimed they could profitably mine through low-cost, fixed term energy contracts and by using high quality mining equipment. In reality, Touzi Capital's "breakeven" point for mining bitcoin was misleading, because the way this was calculated excluded known factors. Moreover, the energy costs for Touzi Capital's crypto-asset mining businesses fluctuated greatly, and it consistently had problems with its equipment.

5. Touzi Capital and the businesses it oversaw now appear to have collapsed. Touzi Capital's investors have not been able to get answers from the company or from Taing and, according to several investors, he has stopped communicating with them.

6. Taing controls all of the bank accounts of Touzi Capital and its affiliates, and additionally appears to retain control over investor assets in the form of several virtual wallets that may hold more than $14 million worth of bitcoin.

7. By engaging in this conduct, Defendants violated the registration and

antifraud provisions of Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

8.     Accordingly, the SEC seeks permanent injunctions, disgorgement of ill-gotten gains, along with pre-judgment interest, civil penalties against Defendants Taing and Touzi Capital, and an officer and director bar against Defendant Taing.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

10.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

11.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Eng Taing resides in this district, and because Defendant Touzi Capital, LLC has its principal place of business in this district.

## DEFENDANTS

12.     **Eng Taing**, age 39, is a resident of San Marcos, California.  Taing is the sole member of Touzi Capital, LLC.

13.     **Touzi Capital, LLC**, is a California limited liability company located in San Marcos, California.

///

## RELATED ENTITIES

### A.      PECC Entities

14.    **PECC Fund I LLC** is a Delaware limited liability company managed by Defendant Taing.

15.    **PECC Fund II LLC** on information and belief is a fictitious business name used by Taing and Touzi Capital.

16.    **PECC Fund III LLC** is a Delaware limited liability company managed by Defendants Taing and Touzi Capital.

17.    **PECC Corp.** is a Delaware corporation controlled by Taing and Touzi Capital.

### B.      BTC Fund I Entities

18.    **Teracel Blockchain Fund LLC** is a Delaware limited liability company managed by Touzi Capital.

19.    **Teracel I LLC** is a Delaware limited liability company managed by Touzi Capital.

### C.      BTC Fund II Entities

20.    **Teracel Blockchain Fund II LLC** is a Delaware limited liability company managed by Touzi Capital.

21.    **Teracel II LLC** is a Delaware limited liability company managed by Touzi Capital.

### D.      BTC Fund III Entities

22.    **Touzi Data Tech LLC** is a Delaware limited liability company managed by Touzi Capital.

23.    **Touzi Data Technology LLC** is a Delaware limited liability company managed by Touzi Capital.

24.    **Touzi Tech LLC** is a Delaware limited liability company managed by Touzi Capital.

///

### E.    <u>BTC Fund IV Entities</u>

25.    **Touzi Mine Invest LLC** is a Wyoming limited liability company managed by Touzi Capital.

26.    **Touzi Mining Invest LLC** is a Wyoming limited liability company managed by Touzi Capital.

27.    **Touzi Mining Inv LLC** is a Wyoming limited liability company managed by Touzi Capital.

28.    **Touzi Mining Inv II LLC** is a Wyoming limited liability company managed by Touzi Capital.

29.    **Touzi Mining Invest II, LLC** is a Wyoming limited liability company managed by Touzi Capital.

30.    **Touzi Mining LLC** is a Wyoming limited liability company managed by Touzi Capital.

### F.    <u>BTC Fund V Entities</u>

31.    **Touzi DC Invest LLC** is a Wyoming limited liability company managed by Touzi Capital.

32.    **Touzi Data Center Invest LLC** is a Wyoming limited liability company managed by Touzi Capital.

33.    **Touzi Data Center Inv LLC** is a Wyoming limited liability company managed by Touzi Capital.

34.    **Touzi Data Center, LLC** is a Wyoming limited liability company managed by Touzi Capital.

### G.    <u>BTC Fund VI Entities</u>

35.    **Touzi Gem Inv, LLC** is a Wyoming limited liability company managed by Touzi Capital.

36.    **Touzi Gem Mining Inv LLC** is a Wyoming limited liability company managed by Touzi Capital.

///

# FACTUAL ALLEGATIONS

**A.     Touzi's Formation and Offerings**

37.     In 2020, Taing formed Touzi Capital.

38.     At all times since Touzi Capital's formation, Taing has been the sole managing member of Touzi Capital.

39.     At all times since Touzi Capital's formation, Taing has controlled Touzi Capital and its day-to-day operations.

40.     At all times since Touzi Capital's formation, Taing has controlled Touzi Capital's bank accounts and crypto asset wallets.

41.     In 2020, Taing and Touzi Capital began offering investors equity interests in funds that were formed to fund the businesses that Taing managed through Touzi Capital.

42.     Defendants' initial investors consisted largely of former co-workers, but the number of investors expanded as Defendants solicited investors more broadly.

43.     Touzi Capital solicited investors for its offerings via webinar presentations hosted by Taing, podcasts on which Taing was a guest, and online investor forums on Reddit and elsewhere.

44.     Touzi Capital maintained an online portal open to the public where it made available its PPMs, power points, and other offering materials and provided interested investors with wiring instructions.

45.     Between 2020 and 2024, Taing managed more than two dozen businesses, most of which fell within four broad areas: crypto asset mining, debt rehabilitation, the construction of assisted-living facilities, and the development of commercial real estate.

46.     By 2022, Taing claimed to manage more than $350 million of investor funds through Touzi Capital's various business interests.

///

///

**B.    The Touzi Capital PECC Offerings**

    **1.    Defendants Raised Over $22 Million for Touzi Capital's Distressed Debt Businesses**

47.    In or around December 2020, Defendants began raising money for what they called "Private Equity Consumer Credit" funds (the "PECC Funds"). They represented that after receiving investor capital, the funds would in turn invest fund assets in PECC Corp. ("PECC"), an operating company controlled by Taing and Touzi Capital. According to defendants, PECC then invested in businesses that purportedly provided legal services to consumers in exchange for a monthly fee. The legal services supposedly were designed to reduce the debt that the consumers owed.

48.    According to the terms of the PECC Fund subscription agreements, PECC would use investor monies to "exclusively" purchase "receivables," defined as certain payment obligations under consumer contracts. Taing told investors that PECC would purchase these receivables from a law firm working on debt rehabilitation, but he did not identify the name of the firm.

49.    As represented by Taing, PECC acquired the accounts of persons with significant amounts of debt, some or all of which could be invalidated through legal processes conducted by Litigation Practice Group ("LPG"). The debtor paid a service fee for the debt invalidation, with 40% going to LPG and with PECC receiving 60% of the fees. PECC purchased this right to receive fees from an entity called Validation Partners LLC ("Validation Partners"). PECC claimed that it typically acquired the accounts for $2,000 apiece and received $8,000 in program fees paid by the debtors over the course of 24 to 36 months.

50.    Taing and Touzi Capital raised money for PECC through three offering entities ("the PECC Funds").

51.    Taing and Touzi Capital also raised money for PECC through the sale of promissory notes ("the PECC Notes").

52.    There were approximately 283 investors in the PECC Funds and Notes.

53.    Investors in multiple states purchased securities in the PECC Fund and Note offerings.

54.    Between December 2020 and March 2023, Taing and Touzi Capital raised over $22 million through the PECC Fund and Note offerings.

55.    Touzi Capital was the manager of each of the PECC Fund offering entities, and Taing was the manager of Touzi Capital.

### a.    PECC Fund I

56.    In the PECC Fund I offering, Defendants offered securities in the form of membership interests in PECC Fund I LLC.  These membership interests, also called LLC units, were not registered with the SEC.

57.    Taing and Touzi Capital raised approximately $6.23 million from about 120 investors through the PECC Fund I offering from December 2020 through August 2022.

58.    Investors in PECC Fund I were promised distributions of 12 percent per year and the return of their full invested capital after one year.

59.    The PECC Fund I offering documents stated that investor funds would be used "to purchase preferred stock of PECC Corp, which will in turn be used to purchase Receivables exclusively."

60.    On August 18, 2021, PECC Fund I LLC filed an SEC Form D, *Notice of Exempt Offering* ("Form D"), for an offering of equity securities, claiming that its first sale was August 5, 2021, and that it had already raised $3,400,000.

### b.    PECC Fund II

61.    In the PECC Fund II offering, Defendants offered securities in the form of membership interests in PECC Fund II LLC.  These membership interests, also called LLC units, were not registered with the SEC.

62.    Taing and Touzi Capital raised approximately $3.88 million through the PECC Fund II offering from March 2021 through August 2022.

63.    In documents provided to investors, Defendants represented that PECC

Fund II was a Delaware limited liability company, managed by Defendant Taing, and formed for the purpose of raising funds for PECC Corp.

64.    The Division of Corporations of the State of Delaware does not list any entity on their business registry called PECC Fund II LLC.  "PECC Fund II LLC" therefore appears to be a fictitious name used by Taing and Touzi Capital.

65.    Investors in PECC Fund II were promised distributions of 12 percent per year and the return of their full invested capital after one year.

66.    The PECC Fund II offering documents stated that investor funds would be used "to purchase preferred stock of PECC Corp, which will in turn be used to purchase Receivables exclusively."

67.    No Form D was filed for the PECC Fund II offering.

### c.    PECC Fund III

68.    In the PECC Fund III offering, Defendants offered securities in the form of membership interests in PECC Fund III LLC.  These membership interests, also called LLC units, were not registered with the SEC.

69.    Taing and Touzi Capital raised approximately $4.61 million in PECC Fund III from April 2021 through November 2022.

70.    Investors in PECC Fund III were promised distributions of 10 percent per year and the return of their full invested capital after one year.

71.    The PECC Fund III offering documents stated that investor funds would be used "to purchase preferred stock of PECC Corp, which will in turn be used to purchase Receivables exclusively."

72.    No Form D was filed for the PECC Fund II offering.

### d.    PECC Notes and Unidentified Investments

73.    In addition to the PECC Fund equity offerings, Defendants also raised money for PECC by issuing promissory notes ("PECC Notes").

74.    The PECC Notes were issued by PECC Corp. and promised investors a 14 percent return and the return of their capital after one year.

75.    From December 2020 to March 2023, Touzi Capital entities received over $8.14 million in what appear to be investor funds related to PECC Funds or PECC Notes based on notes on the check or wire, the name of the account into which the funds were deposited, or other evidence.

76.    The following table summarizes the approximate number of investors and the approximate amount of funds raised in the Touzi Capital BTC Fund Offerings:

| Offering | Number of Investors | Amount Raised |
|---|---|---|
| PECC Fund I | 120 | $6,232,376 |
| PECC Fund II | 50 | $3,877,000 |
| PECC Fund III | 47 | $4,608,588 |
| PECC Notes or Unclear | 66 | $8,143,399 |
| **TOTAL PECC** | **283** | **$22,861,363** |

## 2.    Defendants Made False and Misleading Statements to Investors in PECC

77.    As presented to investors, the main appeal of an investment in the PECC Funds and PECC Notes was their guaranteed monthly distributions and their purported liquidity.

78.    In marketing the PECC Funds, Defendants represented to investors that the Funds were "very stable and predictable" and that due to their "highly liquid nature" could be treated as "an alternative to a high-yield savings account."

79.    Taing repeatedly stressed the liquidity of an investment in PECC, telling one investor by email that the PECC Fund III would have "predictable monthly cash flow and liquidity."

80.    These representations about the liquidity and relative safety of the PECC Funds were material and important to investors in their decision to invest with Touzi Capital and Taing.

81.    Defendants marketed the PECC Notes similarly, offering them as an alternative to the PECC Funds and claiming that the only difference was that the

Notes were taxable and thus better suited for investors with a tax-advantaged IRA.

82.    The statements Taing made to investors regarding the PECC Funds and PECC Notes being liquid and relatively safe investments were materially false and misleading for the reasons alleged below.

83.    The PECC Funds and Notes were highly speculative and illiquid because the ability of the PECC Funds and Notes to pay investors the promised returns or provide liquidity was entirely dependent on a chain of intermediaries.  The receivables PECC supposedly acquired were the stream of payments that LPG's clients were supposed to pay for debt rehabilitation services, which LPG would pay to Validation Partners who would in turn pay PECC.  But at every link in that chain between LPG's clients and PECC were significant risks that were not adequately disclosed to investors.  The consumers who had agreed to pay LPG a monthly fee had hired LPG to invalidate or negotiate settlements of their outstanding debts and thus there was a risk they would not make payment on the debts they owed LPG.

84.    Investors in the PECC Funds were also exposed to a wide range of undisclosed risks beyond the risk that the underlying LPG clients would not make their contracted payments, including the risk that LPG would not transfer payments to Validation Partners, the risk that Validation Partners would not transfer the payment to PECC, the risk of fraud by Validation Partners or LPG, and the risk that LPG was operating illegally and violating consumer protection laws, including a law that prohibits for-profit companies that sell debt rehabilitation services over the telephone from charging a fee before they actually settle or reduce a consumer's debt.

85.    Because Defendants did not adequately disclose these risks to investors, Defendants' statements regarding the PECC Funds and PECC Notes being liquid and relatively safe investments were materially misleading.

86.    Taing knew, or was reckless and negligent for not knowing, about these risks because he controlled PECC Corp. and was the manager of all the PECC offering entities.  Taing understood the business model of LPG and Validation

11

Partners and even at one point owned a similar company.

87.    In addition, Taing knew, or was reckless and negligent for not knowing, that these risks were materializing from as early as July 2022, when Validation Partners alerted PECC that it would stop making distributions to PECC, yet he continued to represent to investors that the PECC Funds were liquid and relatively safe investment.

88.    When LPG was falling behind on its payments, Taing insisted that Touzi Capital project confidence in an effort to control the situation.  When a Touzi Capital employee suggested to Taing that he close the PECC fund to new investors, Taing refused.

89.    Instead, from August 2022 to March 2023, Defendants persuaded existing investors to re-invest in the PECC Funds without disclosing the risks and problems with Validation Partners and LPG.

90.    For example, on October 26, 2022, Taing emailed a PECC Fund II investor (KF) whose investment was maturing in November 2022 and provided her assurances that convinced her to re-invest in PECC when her existing investments matured in November 2022 and January 2023.  Taing did not disclose the problems with Validation Partners that had come to his attention at least by July 2022.  Had the investor known about these problems, she would not have re-invested.

91.    On March 20, 2023, LPG filed for bankruptcy.  The receivables PECC acquired from LPG appear to have no current value.  PECC paid $22,962,250 for the purchase of debtor files but only received $14,342,508 in revenue, for a net loss of $8,619,742.

92.    In or around April 2023, PECC ceased making the monthly payments to investors in the PECC Funds and Note investors and ceased honoring liquidation requests.

93.    It was not until May 2023 that Taing told investors that Touzi Capital had, starting in July 2022, experienced payment problems on the PECC funds.

### 3.    Taing Was the Maker of These False and Misleading Statements

94.    Taing was the maker of the materially false and misleading statements regarding the PECC Funds and PECC Notes because he was the managing member and control person of Touzi Capital, and the person who disseminated information about the PECC Funds and PECC Notes to the public.

95.    Taing spoke to prospective PECC investors through online seminars (also known as webinars) that he hosted.  For example, one investor (JG) who attended webinars at which Taing spoke understood the PECC funds to provide guaranteed returns and liquidity.

96.    Taing answered questions from prospective investors directly through Slack, a digital messaging system.

97.    Taing spoke to prospective investors by videoconferencing systems such as Zoom.  One investor (AJ) who had several communications with Taing on Zoom recalled Taing telling him that investing in a PECC Fund would be like investing in a high-yield savings account and stressing its liquidity.

98.    Taing directed prospective investors to an online portal maintained by Touzi Capital that contained promotional materials, including PowerPoints, for various Touzi investment opportunities.

99.    Accordingly, Taing had ultimate authority over the statements regarding the PECC Funds and PECC Notes, including their content and whether and how to communicate those statements to investors and potential investors in the PECC Funds and PECC Notes.

### 4.    Defendants Commingled Funds from Investors in the PECC Funds and Notes with Funds from Unrelated Businesses

100.    The offering documents for the PECC Funds, and by extension the Notes that were marketed as a similar alternative to the PECC Funds, represented that investor funds would be invested in PECC Corp., which in turn would use the funds

to purchase payment obligations under consumer contracts.

101.    In reality, Defendants did not segregate the investors funds they received for the PECC Funds or invest them exclusively in PECC Corp., but instead commingled those monies with other monies invested in unrelated Touzi Capital entities.

102.    In total, PECC Fund accounts transferred a net amount of about $7,585,600 to Touzi Capital accounts.

103.    PECC Fund accounts also made transfers to other Touzi Capital businesses.  For example, on June 1, 2022, Defendants transferred approximately $1,000,500 from a PECC bank account ending in x1352 to an account for an unrelated Touzi Capital business ending in x2836.  That business then used the funds to pay about $920,000 in construction-related bills that were unrelated to PECC's business.

104.    Then, on June 6 and 7, 2022, Defendants transferred a total of approximately $3,000,000 from a PECC Fund account ending in x1352 to a Touzi Capital account ending in x2800, which then paid about $1,038,455 in mining fees for Touzi's crypto asset mining business that were unrelated to PECC's business. Without the transfers from the PECC Fund account, the Touzi Capital account ending in x2800 would have not had sufficient funds to pay the mining fees.

105.    In total, PECC Fund accounts paid approximately $1,592,500 to unrelated Touzi businesses, not including the amounts that were sent directly to Touzi Capital.  Although the PECC Fund accounts received transfers of approximately $6,546,741 from unrelated Touzi businesses, investor funds were not supposed to be commingled in this way, and that commingling was contrary to what Defendants represented to investors in the PPMs.

///

///

///

### 5.   Defendants Offered and Sold Unregistered Securities in the PECC Notes and Funds Offerings

#### a.   The PECC Fund Units Are Securities

106.   Defendants offered and sold equity securities in the PECC Funds in the form of units in the offering entity LLC.

107.   The LLC units represented an ownership interest in the offering company.

108.   Each investor's ownership percentage was equal to the percentage of units they held out of the total units.

109.   Investors in the PECC Funds purchased the securities by providing money to Touzi Capital or the offering entity.

110.   Investor money was supposed to be pooled together and invested in PECC Corp., which in turn was supposed to use the pooled investor money to purchase receivables.

111.   Profits from PECC Corp. were supposed to be shared with investors through the promised distributions.

112.   Investor's ability to profit was dependent on Taing and Touzi Capital's ability to successfully operate PECC Corp.

113.   Investors in the PECC Funds did not exercise any control or management over the LLCs, each of which was solely managed by Touzi Capital and controlled by Taing.

114.   Defendants sold securities in the PECC Funds to at least 217 investors located in in California, Idaho, New York, and other states.

#### b.   The PECC Notes Are Securities

115.   The PECC Notes offered and sold by Defendants are also securities.

116.   Investors in the PECC Notes purchased the promissory notes by providing money to Touzi Capital or PECC.

117.   The PECC Notes promised investors returns of 14 percent per year,

which far exceeded the rates available on traditional and more conservative retirement investments such as CDs or money market accounts.

118.   Defendants claimed they would use the monies raised from investors to finance the operating expenses of PECC Corp.

119.   Defendants marketed, offered and sold the notes to a broad segment of the public.

120.   A reasonable member of the investing public would consider the notes to be securities, as they viewed the notes as an investment given how Defendants marketed them as high-return opportunities for investors.

121.   There is no alternate regulatory scheme for the PECC Notes.

122.   Profits from PECC Corp. were supposed to be shared with note investors through the promised returns.

123.   Investor's ability to profit was dependent on Taing and Touzi Capital's ability to successfully operate the debt rehabilitation business.

124.   Investors in the PECC Notes did not exercise any control or management over PECC Corp.

   **c.** **The PECC Fund and Note Securities Were Unregistered and Not Subject to an Exemption from Registration**

125.   None of the PECC Fund or PECC Note offerings were registered with the SEC.

126.   None of the PECC Fund or PECC Note offerings were subject to a valid exemption from registration.

127.   Taing and Touzi Capital engaged in general solicitation of investors for the PECC Fund and PECC Note offerings.

128.   Taing spoke to prospective investors through online seminars (also known as webinars) that he hosted.

129.   Taing answered questions from prospective investors directly through Slack, a digital messaging system.

130. Taing spoke to prospective investors by videoconferencing systems such as Zoom.

131. Taing directed prospective investors to an online portal maintained by Touzi Capital that contained promotional materials, including PowerPoints, for various Touzi investment opportunities.

132. Defendants did not provide investors with audited financial statements for the PECC Fund and PECC Note offerings.

133. Touzi Capital had potential investors in the PECC Fund and PECC Note offerings indicate whether they were accredited, but did nothing to verify the assertions of those who claimed to be accredited investors.

134. Touzi Capital did not assess the sophistication of prospective investors who disclosed that they were not accredited.

**C.   The Touzi BTC Funds**

   **1.   Defendants Raised Over $94 Million for Touzi Capital's Crypto Asset Mining Businesses**

135. Touzi Capital also offered investors the opportunity to invest in funds that claimed investor funds would be used to mine bitcoin and other crypto assets (the "BTC Funds").

136. Taing and Touzi Capital raised approximately $94 million from investors for the Touzi BTC Funds.

137. There were roughly 1,573 investors in the BTC Funds located in California, New York, Texas, and other states.

138. The Touzi BTC Funds consisted of 6 groups of funds. Each group consisted of one or more offering entities that purported to invest in an operating entity engaged in the business of crypto asset mining.

139. Touzi Capital was the manager of each of the BTC Fund offering entities, and Taing was the manager of Touzi Capital.

140. Although the purpose of each of the BTC Funds was to finance crypto

asset mining activities, they purported to raise money for different operating entities, which were supposed to acquire mining equipment and pay returns based on the performance of those miners.

### a.    BTC Fund I

141.    The first fund ("BTC Fund I") consisted of one offering entity, Teracel Blockchain Fund, LLC, whose proceeds were supposed to be invested in one operating entity, Teracel I LLC.

142.    Taing and Touzi Capital raised approximately $3.47 million from about 92 investors located in California, New York, Texas, Georgia, and other states through the BTC Fund I offering from March through September 2021.

143.    According to an investor presentation for BTC Fund I, investor funds would be used to acquire mining equipment in March 2021 and begin mining in the second quarter of 2021 at a facility in Kearney, Nebraska.

144.    Investors in BTC Fund I received securities in the form of limited liability interests in Teracel Blockchain Fund, LLC.

145.    On May 20, 2021, Teracel Blockchain Fund, LLC filed a Form D for a $5 million offering of equity securities, which was signed by Taing.  The filing claimed that its first sale was March 8, 2021, and that it had already raised $4,145,000.

### b.    BTC Fund II

146.    The second fund ("BTC Fund II") consisted of one offering entity, Teracel Blockchain Fund II, LLC, whose proceeds were supposed to be invested in one operating entity, Teracel II LLC.

147.    Taing and Touzi Capital raised approximately $3.25 million from about 110 investors located in California, Texas, New Jersey, and other states through the BTC Fund II offering from June through September 2021.

148.    According to an investor presentation for BTC Fund II, investor funds would be used to acquire 500 miners in June 2021 and be setup by September 2021 at

1  facilities in Kearney, Nebraska, and Big Springs, Texas.

2       149.   Investors in BTC Fund II received securities in the form of limited

3  liability interests in Teracel Blockchain Fund II, LLC.

4       150.   On August 18, 2021, Teracel Blockchain Fund II, LLC filed a Form D

5  for a $5 million offering of equity securities.  The filing claimed that its first sale was

6  August 4, 2021, and that it had already raised $5,000,000.

7            **c.**   **BTC Fund III**

8       151.   The third fund ("BTC Fund III") consisted of two offering entities,

9  Touzi Data Tech, LLC and Touzi Data Technology, LLC,  whose proceeds were

10  supposed to be invested in one operating entity, Touzi Tech LLC.

11       152.   Taing and Touzi Capital raised approximately $11.79 million from about

12  284 investors located in California, Texas, Florida, and other states through the BTC

13  Fund III offering from April 2021 through March 2022.

14       153.   According to an investor presentation for BTC Fund III, it would acquire

15  1,000 miners in August 2021 that would be setup by December 2021 at facilities in

16  Pueblo, Colorado.

17       154.   Investors in BTC Fund III received securities in the form of limited

18  liability interests in Touzi Data Tech, LLC or Touzi Data Technology, LLC.

19       155.   Touzi Data Tech, LLC did not file a Form D but claimed in its offering

20  documents that it was conducting a $10 million offering.

21       156.   On August 8, 2022, Touzi Data Technology, LLC filed a Form D for a

22  $10 million offering of equity securities, claiming that its first sale was November 8,

23  2021, and that it had already raised $3,236,100.

24            **d.**   **BTC Fund IV**

25       157.   The fourth fund ("BTC Fund IV") consisted of five offering entities,

26  Touzi Mine Invest, LLC, Touzi Mining Invest, LLC, Touzi Mining Inv, LLC, Touzi

27  Mining Inv II, LLC, and Touzi Mining Invest II, LLC, whose proceeds were

28  supposed to be invested in one operating entity, Touzi Mining LLC.

158.    Taing and Touzi Capital raised approximately $32.89 million from about 597 investors located in California, New York, Texas, and other states through the BTC Fund IV offering from November 2021 through June 2022.

159.    According to an investor presentation for BTC Fund IV, it would acquire miners in February 2022 and begin mining by May 2022 at facilities in Sandusky, Ohio.

160.    Investors in BTC Fund IV received securities in the form of limited liability interests in one of the five offering entities.

161.    Touzi Mining Invest II, LLC filed a Form D on July 15, 2022, for a $40 million offering of equity securities, claiming that its first sale was May 3, 2022, and that it had already raised $11,351,000.  None of the other offering entities in BTC Fund IV filed a Form D.

### e.    BTC Fund V

162.    The fifth fund ("BTC Fund V") consisted of three offering entities, Touzi DC Invest, LLC, Touzi Data Center Invest, LLC, and Touzi Data Center Inv LLC, whose proceeds were supposed to be invested in one operating entity, Touzi Data Center, LLC.

163.    Taing and Touzi Capital raised approximately $15.14 million from about 75 investors located in California, Illinois, Florida, and other states through the BTC Fund V offering from March through June 2022.

164.    The PPMs for BTC Fund V stated that Touzi Data Center LLC would use the funds raised "to acquire and lease the data center rack space and bitcoin mining equipment to bitcoin miners at the Company's new plant in Sandusky, Ohio."

165.    Investors in BTC Fund V received securities in the form of limited liability interests in one of the three offering entities.

166.    None of the offering entities in BTC Fund V filed a Form D.

### f.    BTC Fund VI

167.    The sixth fund ("BTC Fund VI") consisted of one offering entity, Touzi

Gem Inv, LLC, whose proceeds were supposed to be invested in one operating entity, Touzi Gem Mining Inv LLC.

168.    Taing and Touzi Capital raised approximately $9.41 million from about 166 investors located in California, Texas, Illinois, and other states through the BTC Fund VI offering from August to October 2022.

169.    According to an investor presentation for BTC Fund VI, it was acquiring discounted mining equipment that was already installed and therefore mining could start immediately after the fund closed in September 2022 at facilities in North Dakota, Texas, and North Carolina.

170.    Investors in BTC Fund VI received securities in the form of limited liability interests in Touzi Gem Inv, LLC.

171.    Touzi Gem Inv, LLC did not file a Form D but claimed in its offering documents that it was conducting a $10 million offering.

### g.    Additional BTC Investors

172.    In addition, from November 2021 to November 2022, Touzi Capital entities received roughly $18.09 million from approximately 249 investors that appear to be investor funds related to a BTC Fund based on notes on the check or wire, the name of the account into which it was deposited, or other evidence, but due to insufficient identifying information cannot be matched to a specific fund.

173.    The following table summarizes the Touzi Capital BTC Fund Offerings, the approximate number of investors and amounts raised in those offerings:

| Offering | Number of Investors | Amount Raised |
|---|---|---|
| **BTC FUND I** | | **$3,472,832** |
| Teracel Blockchain Fund | 92 | |
| | | |
| **BTC FUND II** | | **$3,254,547** |
| Teracel Blockchain Fund II | 110 | |
| | | |
| **BTC FUND III** | | **$11,793,983** |

| **Offering** | **Number of Investors** | **Amount Raised** |
|---|---|---|
| Touzi Data Tech | 211 | |
| Touzi Data Technology | 73 | |
| | | |
| **BTC FUND IV** | | **$32,889,595** |
| Touzi Mine Invest | 261 | |
| Touzi Mining Invest | 199 | |
| Touzi Mining Inv | 2 | |
| Touzi Mining Inv II | 68 | |
| Touzi Mining Invest II | 67 | |
| | | |
| **BTC FUND V** | | **$15,144,050** |
| Touzi DC Invest | 55 | |
| Touzi Data Center Invest | 20 | |
| Touzi Data Center Inv | Unknown | |
| | | |
| **BTC FUND VI** | | **$9,410,000** |
| Touzi Gem Inv | 166 | |
| | | |
| **Unable to Classify** | 249 | **$18,087,100** |
| | | |
| **TOTAL** | **1,573** | **$94,052,107** |

## 2.    Defendants Made False and Misleading Statements to Investors in the Touzi BTC Funds

174.    Taing and Touzi Capital, through offering documents, promotional materials, and conversations with investors, made three main claims to investors about the BTC Funds that were materially false and misleading.  First, the BTC Funds would be able to mine bitcoin at a cost that would make the funds profitable, so long as the price of bitcoin stayed above $10,000.  Second, this was possible, in part, because of the fixed, low-cost energy contracts the BTC Funds had that provided the operations with predictable costs.  Third, this was also possible because the BTC Funds had secured high-quality mining equipment at discounted prices that

would be operated by leading crypto asset service providers.

175.   For example, Defendants' presentations for BTC Fund I, BTC Fund II, and BTC Fund III all touted a "[f]ixed low cost energy contract that provides predictable costs at scale."

176.   The BTC Fund II presentation stated that Touzi Capital's current cost to mine one bitcoin was only $8,814, and that it had "secured" hardware at 30 percent off retail pricing and a "low cost fixed energy contract near renewable power" at 50 percent off consumer cost.

177.   The BTC Fund III presentation stated its current cost to mine one bitcoin was only $8,155 and similarly represented that it had hardware "secured" at a wholesale price and "low cost fixed energy contract near renewable power" at 50 percent off consumer cost.  In an email to potential investors concerning BTC Fund III, Taing again said that there would be a "Low Cost of Mining: $8k to mine one bitcoin."

178.   The BTC Fund IV investor presentation claimed that $10,000 was its "low cost to mine [bitcoin]" and that this provided "downside protection" to the fund. It reiterated in other places in the presentation that BTC Fund IV's "bitcoin mining has relatively low fixed cost," and that $10,000 was its "breakeven price of bitcoin."

179.   The BTC Fund VI investor presentation claimed that it would assume a third party's hosting contract that "locked in reduced pricing from before supply shock and energy price surge" and that the cost to mine one bitcoin would be $10,000.  In a webinar promoting Bitcoin Fund VI, Taing claimed that it would remain profitable even if the price of bitcoin were to drop to $12,000.

180.   Taing made similar statements to numerous investors, claiming that Touzi Capital could mine bitcoin at low costs such that its breakeven ranged from $8,000 to $10,000 because it had locked-in energy costs for several years.

181.   The first claim that Defendants made to investors about the BTC Funds – that between $8,000 to $10,000 was the "breakeven" point for profitability – was

materially false and misleading.

182.   At most times during the BTC Fund offerings, the price of bitcoin varied from $20,000 to $40,000, sometimes going as high as $60,000, but never less than $16,000.  Based on the representations Defendants made to investors, at those price points, the BTC Funds should have profitable.

183.   Defendants' statements were materially false and misleading because Taing did not include the difficulty of mining in the calculated breakeven point.  The difficulty of mining refers to the known principle that, as more and more crypto asset miners compete to mine bitcoin, the complexity and thus cost of mining increases.  The breakeven claim also assumed that miners could run 24 hours a day, when in reality, there was downtime when the mining equipment was not running at all.

184.   Taing knew, or was reckless and negligent for not knowing, the claims about the "breakeven" point for the BTC Funds were materially false and misleading.  In either 2021 or 2022, Touzi's former head of investor relations discussed with Taing the flaws in Taing's methodology for calculating the Funds' breakeven point.  Specifically, he told Taing how his two-factor formula skewed the results because it failed to account for the difficulty of mining and the impact of downtime.  However, Taing dismissed these concerns and continued to market his flawed pricing formula to investors.

185.   Although the risk of "difficulty growth" was briefly mentioned in the BTC Funds' PPMs and referenced in some investor presentations, it was not included in the claimed cost to mine bitcoin or factored into the representations about investors' breakeven point.

186.   The second claim that Defendants made to investors about the BTC Funds – that the BTC Funds had fixed, low-cost energy contracts that provided the operations with predictable costs – was also materially false and misleading.

187.   From February 2021 to October 2022, Touzi Capital entities entered into at least six different energy contracts with five different providers, at prices ranging

from $0.046 to $0.08 per kilowatt hour – a variance of more than 40%.

188.   Taing also sometimes sought energy from short-term sources at higher prices.

189.   Taing knew, or was reckless and negligent for not knowing, the claims about the fixed energy costs for the BTC Funds were materially false and misleading, as he was personally involved in arranging the energy contracts and short-term sources.

190.   The third claim that Defendants made to investors about the BTC Funds – that the BTC Funds had secured high-quality mining equipment at discounted prices – was materially false and misleading.

191.   In marketing the BTC Fund III, Defendants touted that they had secured "1000 Bitmain Antminer S19J Pros" that would be installed and setup by December 2021.  However, according to Touzi Capital Head of Crypto Mining, while Touzi Capital did enter into a contract with Bitmain for 1,000 Antminer S19s, it only received 334 working machines and over 600 machines that were unusable "junk miners."

192.   While raising money for its BTC Fund IV offering in 2022, Defendants claimed that "Touzi Capital has launched 3 previous Bitcoin Mining funds and consistently exceeded projections."

193.   The Bitmain junk miners were not an isolated problem.  Touzi purchased $42 million worth of miners and hosting services from Compass Mining, Compute North, and Elite Mining, all of which subsequently filed for bankruptcy or went out of business, and the miners purchased were either inactive or unrecoverable.

194.   Taing knew, or was reckless and negligent for not knowing, the claims about the mining equipment for the BTC Funds were materially false and misleading, as he was personally involved in negotiating to acquire the equipment and dealing with the problems in the equipment.

195.   As a result of the false and misleading statements Defendants made to

investors about the BTC Funds, Defendants' ability to pay its promised returns fluctuated wildly. Taing blamed the falling price of bitcoin and the rising cost of energy. But while the market price of bitcoin has fluctuated greatly since the first BTC Fund offerings commenced in March 2021, its price never fell below $16,000, far more than what Defendants led many investors to believe was their breakeven point.

196. Defendants' statements to investors regarding how much it would cost to mine Bitcoin, having fixed, low-cost energy contracts and the ability to secure high-quality mining equipment at discounted prices were material and important to investors in making their investment decisions.

### 3. Taing Was the Maker of These False And Misleading Statements

197. Taing was the maker of the statements regarding the BTC Funds because he was the managing member and control person of Touzi Capital, and the person who disseminated information about the BTC Funds to the public.

198. Taing spoke to prospective BTC Fund investors through online seminars (also known as webinars) that he hosted. For example, one investor (KT) who watched a webinar at which Taing spoke and reviewed related presentations understood that the price at which Touzi could mine Bitcoin was determined by the cost of hosting and electricity and that Touzi had energy contracts in place that would keep its costs static for a significant period of time.

199. Taing answered questions from prospective investors directly through Slack, a digital messaging system.

200. Taing spoke to prospective investors by videoconferencing systems such as Zoom.

201. Taing directed prospective investors to an online portal maintained by Touzi Capital that contained promotional materials, including PowerPoints, for various Touzi investment opportunities.

202.   Accordingly, Taing had ultimate authority over the statements regarding the BTC Funds, including their content and whether and how to communicate those statements to investors and potential investors in the BTC Funds.

### 4.    Defendants Commingled Funds from Investors in the BTC Funds with Funds from Unrelated Businesses

203.   Each BTC Fund PPM represented that funds raised would be invested in a specific crypto asset mining company formed for the primary business of engaging in blockchain mining activities.

204.   In reality, funds raised from investors in the Touzi BTC Funds were used for bitcoin mining, though not always the specific project the investor had invested in, and were also commingled with funds from Touzi Capital's various other businesses and sometimes spent on costs unrelated to crypto asset mining.

205.   Touzi Capital raised approximately $94 million from investors for its BTC Funds, but only about $74.4 million was directly deposited to bank accounts in the name of a particular BTC Fund.

206.   For example, Touzi Mining Invest, LLC raised approximately $55.7 million for the stated purpose of investing in Touzi Mining LLC, but Defendants sent only about $2.6 million to that entity's bank account ending in x6379.  Instead, Touzi Mining Invest, LLC transferred approximately $48 million to one of the Touzi Capital accounts ending in x2800, which then made distributions to various other Touzi Capital entities – some of which had nothing to do with bitcoin mining.

207.   Touzi Data Center Invest LLC raised roughly $6,283,050 for the stated purpose of investing in Touzi Data Center LLC but Defendants sent only about $13,000 to that entity's bank account ending in x8300. Instead, Defendants sent approximately $4,000,000 to a PECC account ending in x1352, approximately $1,211,000 to a Touzi Capital account ending in x2800, and roughly $800,000 to an account ending in x5039 held by Touzi Opportunity Fund, a real estate venture entirely unrelated to crypto asset mining.

208.   Bank records show that Defendants spent substantial amounts to purchase or host bitcoin mining machinery, but Touzi Capital did not apportion those costs or distribute those ownership interests to the various Touzi BTC Funds in accordance with the terms of the investments.

**5.    Defendants Offered and Sold Unregistered Securities in the BTC Fund Offerings**

**a.    The BTC Fund LLC Units Are Securities**

209.   The interests that Defendants offered and sold in the BTC Funds in the form of units in the entity LLC were securities.

210.   The LLC units represented an ownership interest in the offering company.

211.   Each investor's ownership percentage was equal to the percentage of units they held out of the total units.

212.   Investors in the BTC Funds purchased the LLC units by providing money to Touzi Capital.

213.   Investor money was supposed to be pooled together and invested in each fund's operating entity, which in turn was supposed to use the pooled investor money for bitcoin mining operations.

214.   Profits from the bitcoin mining operations were supposed to be shared on a pro rata basis with each fund's investors.

215.   Investor's ability to profit was dependent on Taing and Touzi Capital's ability to successfully operate the various operating companies for each fund.

216.   Investors in the BTC Funds did not exercise any control or management over the LLCs, each of which was solely managed by Touzi Capital and controlled by Taing.

**b.    The BTC Fund Securities Were Unregistered and Not Subject to an Exemption from Registration**

217.   None of the BTC Fund offerings were registered with the SEC.

218.    None of the BTC Fund offerings were subject to a valid exemption from registration.

219.    Taing and Touzi Capital engaged in a general solicitation of investors for the BTC Funds offerings.

220.    Taing spoke to prospective investors through online seminars (also known as webinars) that he hosted.

221.    Webinars featuring Taing promoting the BTC Fund offerings were posted to YouTube.

222.    Taing answered questions from prospective investors directly through Slack, a digital messaging system.

223.    Taing spoke to prospective investors by videoconferencing systems such as Zoom.

224.    Defendants did not provide investors with audited financial statements for the BTC Funds.

225.    Touzi Capital had potential investors in the BTC Fund offerings indicate whether they were accredited, but did nothing to verify the assertions of those who claimed to be accredited investors.

226.    Touzi Capital did not assess the sophistication of prospective investors who disclosed that they were not accredited.

**D.    Defendant Taing Misappropriated Investor Funds and Retains Control of Bitcoin Wallets Related to the Touzi Capital Businesses**

227.    Between in or about November 2020 and December 2023, Taing misappropriated investor funds by using Touzi Capital funds to benefit himself.

228.    Bank records show net transfers of approximately $3.1 million from Touzi Capital's bank accounts to Taing's personal bank accounts.

229.    Bank records show that approximately $700,000 in Touzi Capital funds were used to make payments to credit cards, including a country club and a preschool, which, on information and belief, were for Taing's personal benefit.

230.    Taing had control over the bank accounts used to make these transfers and payments that benefitted him personally and, on information and belief, caused these transfers and payments to be made.

231.    In total, Taing diverted roughly $3.8 million in Touzi Capital funds to his own personal benefit.

232.    In addition, five new crypto wallets were created using funds from accounts associated with Touzi Capital between January and June 2023, which received crypto assets with a value of at least $14.2 million as of July 1, 2024 (the "Touzi Wallets").  On information and belief, these crypto assets are the proceeds of BTC Fund investments.

233.    On information and belief, Taing is the only person with access to and control of the Touzi Wallets.

**E.    Defendant Taing Made Lulling Statements to Investors**

234.    In a May 3, 2023 email to investors, Taing promised investors that he would provide them with "frequent updates" and "answers to questions" at a webinar that he was to host the following week.  There have been no meaningful updates from Taing since then, who has generally not responded to the hundreds of emails and phone messages he has received from investors.

235.    Prior to that silence, according to its former head of investor relations, Taing told investors that Touzi had lost money when Celsius Mining, FTX and Silicon Valley Bank collapsed.  But Touzi did not have any accounts at Silicon Valley Bank, and its former employee believes Taing was using all three events as convenient excuses.

**F.    Defendants' Scienter and Negligence**

236.    Defendant Taing knew, or was reckless or negligent in not knowing, that he made and disseminated materially false and misleading statements to potential investors in connection with the PECC and BTC offerings.

237.    Taing controlled and managed all the offering and operating entities

involved in the PECC and BTC offerings.

238.    Taing had access to all of Touzi Capital's financial accounts and crypto asset wallets.

239.    Taing engaged in extensive communications with potential investors through online platforms, email, and conversation.

240.    Taing understood the business model of LPG and Validation Partners and even at one point owned a similar company.

241.    Taing knew, or was reckless and negligent for not knowing, that PECC investments were not similar to a money-market fund and had significant risks.

242.    Taing knew, or was reckless and negligent for not knowing, that these risks were materializing from as early as July 2022, when Validation Partners alerted PECC that it would stop making distributions to PECC, yet he continued to represent to investors that the PECC Funds were liquid and relatively safe investment.

243.    Taing knew, or was reckless and negligent for not knowing, the claims about the "breakeven" point for the BTC Funds were materially false and misleading. Touzi understood and discussed with another employee how the calculations excluded known factors but continued to use them.

244.    Taing knew, or was reckless and negligent for not knowing, the claims about the fixed energy costs for the BTC Funds were materially false and misleading, as he was personally involved in arranging the energy contracts and short term sources.

245.    Taing knew, or was reckless and negligent for not knowing, the claims about the mining equipment for the BTC Funds were materially false and misleading, as he was personally involved in negotiating to acquire the equipment and dealing with the problems related to the equipment.

246.    Touzi Capital acted through and was controlled by Taing.  Therefore, Taing's knowledge, recklessness, and/or negligence may be imputed to Touzi Capital.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

**(against Defendants Taing and Touzi Capital)**

247.    The SEC realleges and incorporates by reference paragraphs 1 through 246 above.

248.    Defendants Taing and Touzi Capital each made materially false and misleading statements and omissions and engaged in deceptive conduct towards the investors in connection with the offering of the PECC Notes, the PECC Funds and the BTC Funds by commingling investor funds with funds for other Touzi Capital companies, by claiming that investor funds would be used for discrete purposes, by making claims about the safety of the PECC investments, by making claims about the costs to mine bitcoin, energy costs, and mining equipment, and by misappropriating investor funds for Taing's personal benefit.

249.    By engaging in the conduct described above, Defendants Taing and Touzi Capital with scienter, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

250.    By engaging in the conduct described above, Defendants Taing and Touzi Capital violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Taing and Touzi Capital)

251.    The SEC realleges and incorporates by reference paragraphs 1 through 246 above.

252.    Defendants Taing and Touzi Capital each made materially false and misleading statements and omissions and engaged in deceptive conduct towards the investors in connection with the offering of the PECC Notes, the PECC Funds and the BTC Funds by commingling investor funds with funds for other Touzi Capital companies, by claiming that investor funds would be used for discrete purposes, by making claims about the safety of the PECC investments, by making claims about the costs to mine bitcoin, energy costs, and mining equipment, and by misappropriating investor funds for Taing's personal benefit.

253.    By engaging in the conduct described above, Defendants Taing and Touzi Capital and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

254.    Defendants Taing and Touzi Capital, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or

negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

255.   By engaging in the conduct described above, Defendants Taing and Touzi Capital violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a).

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Taing and Touzi Capital)

256.   The SEC realleges and incorporates by reference paragraphs 1 through 246 above.

257.   Defendants Taing and Touzi Capital directly and indirectly offered and sold securities in the BTC Funds, PECC Funds, and PECC Notes in offerings that were not registered with the SEC and that were not subject to a valid exemption to registration.

258.   By engaging in the conduct described above, Defendants Taing and Touzi Capital, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

259.   By engaging in the conduct described above, Defendants Taing and Touzi Capital each violated, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Taing and Touzi Capital and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Taing from directly or indirectly, including but not limited to, through any entity owned or controlled by Taing, participating in the issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## IV.

Enter an order against Defendant Taing pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

## V.

Order Defendants Taing and Touzi Capital to disgorge all funds received from

35

their illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

## VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  November 20, 2024

*/s/ Jasmine M. Starr*

JASMINE M. STARR
PETER F. DEL GRECO
Attorneys for Plaintiff
Securities and Exchange Commission