Kenneth P. Herzinger (SBN 209688)
Kelsey R. McQuilkin (SBN 340288)
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone: (415) 856-7000
Facsimile: (415) 856-7100
kennethherzinger@paulhastings.com
kelseymcquilkin@paulhastings.com

*Attorneys for Defendants*
ENG TAING and TOUZI CAPITAL, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>    v.<br><br>ENG TAING AND TOUZI CAPITAL, LLC,<br><br>               Defendants. | CASE NO. 3:24-cv-2179-CAB-BJW<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: February 20, 2026<br>Courtroom: 15A<br>Judge: Hon. Cathy Ann Bencivengo<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

**TO THE HONORABLE JUDGE OF THE DISTRICT COURT AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on February 20, 2026, or as soon thereafter as the matter may be heard in Courtroom 15A, Defendants Eng Taing ("Taing") and Touzi Capital, LLC ("Touzi Capital") (together "Defendants") will and hereby do move for dismissal with prejudice of the Securities and Exchange

Commission's ("SEC") claims under Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder and Section 17(a) of the Securities Act of 1933 ("Securities Act") in the Complaint pursuant to Federal Rule of Civil Procedure 12(c) for the reasons outlined in Defendants' Motion for Partial Judgment on the Pleadings.

DATED:  January 16, 2026                    PAUL HASTINGS LLP


By:  _/s/ Kenneth P. Herzinger_
        KENNETH P. HERZINGER

*Attorneys for Defendants*
ENG TAING and TOUZI CAPITAL, LLC

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

   A.  THE PECC ALLEGATIONS. .....................................................................2

      1.  Defendants Acquired Debt Rehabilitation Revenue Streams, as Defendants Told Investors They Would. .................2

      2.  PECC Paid All the Funds It Raised to Business Counterparties, as It Said It Would. .............................................3

      3.  Subsequent Unforeseen Events Detrimentally Impacted Defendants' Debt Rehabilitation Business. ..................................4

      4.  The Alleged PECC Misstatements and Omissions. ...................5

   B.  THE BTC ALLEGATIONS. ........................................................................6

      1.  Defendants' Created a Crypto Asset Mining Business, as They Said They Would. ........................................................6

      2.  Funds Raised from the BTC Offerings Were Used for Bitcoin Mining, as Defendants Said They Would Be. ...............6

      3.  Subsequent Unforeseen Events Detrimentally Impacted Defendants' Bitcoin Mining Business. ......................................8

      4.  The Alleged BTC Misrepresentations. .......................................9

III.  LEGAL STANDARD ........................................................................................10

IV.  ARGUMENT ....................................................................................................11

   A.  THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE PECC MISSTATEMENT OR OMISSION. ...............................................11

      1.  The Complaint Alleges Generalized Statements of Corporate Optimism, Puffery, and Opinions, Which Are Not Actionable. ......................................................................12

      2.  There Is No Rule of Completeness or Duty to Disclose and the Complaint Fails to Plead an Actionable Omission. .....................................................................................15

      3.  Impermissible Fraud by Hindsight. ...........................................16

   B.  THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE BTC MISSTATEMENT. .............................................................................17

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

1. Inactionable Opinion/Forward-Looking Statement/Forecast .................................................. 18

2. The SEC Cannot State a Claim by Relying on Fraud by Hindsight .......................................................... 19

3. Defendants Disclosed BTC Risks in Private Placement Memoranda. ................................................. 21

C. THE SEC'S COMMINGLING AND MISAPPROPRIATION ALLEGATIONS FAIL ........................................ 24

V. CONCLUSION ............................................................... 25

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................ 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 555 (2007) ....................................................................... 10

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ................................................................. 16

*In re Checkpoint Therapeutics Sec. Litig.*,
  2025 WL 1434400 (S.D.N.Y. May 19, 2025) ........................................ 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ........................................................... 14, 19

*In re Cornerstone Propane Partners, L.P.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................. 13

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ............................................................... 14

*Dworkin v. Hustler Mag. Inc.*,
  867 F.2d 1188 (9th Cir. 1989) ............................................................... 10

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................... 10

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988, 1008–09 (9th Cir. 2018) ................................................. 17

*Kronk v. Landwin Grp., LLC*,
  2011 WL 13143096 (C.D. Cal. June 7, 2011), *aff'd*, 517 F. App'x
  605 (9th Cir. 2013) ................................................................................. 24

*In re Litig. Prac. Grp., PC*,
  No. 8:23-bk-10571-SC ............................................................................. 5

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d
  Cir. 2015) .......................................................................................... 16, 20

*Markette v. XOMA Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ................................. 14, 18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27, 44 (2011) ........................................................................................ 15

*In re Mellanox Techs. Ltd. Sec. Litig.*,
  2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) .................................................... 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................. 13, 14, 15, 19

*In re OmniVision Techs., Inc. Sec. Litig.*,
  937 F. Supp. 2d 1090 (N.D. Cal. 2013) .............................................................. 16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598, 606 (9th Cir. 2014) ...................................................................... 13

*Plevy v. Haggerty*,
  38 F. Supp. 2d 816 (C.D. Cal. 1998) .................................................................. 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ................................................................ 12, 15, 16

*Resnik v. Swartz*,
  303 F.3d 147, 154 (2d Cir. 2002) ........................................................................ 15

*In re Restoration Robotics, Inc. Sec. Litig.*,
  417 F. Supp. 3d 1242 (N.D. Cal. 2019) .............................................................. 12

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ............................................................................ 13

*SEC v. Francisco*,
  262 F. Supp. 3d 985 (C.D. Cal. 2017) .................................................. 12, 18, 24, 25

*SEC v. Fraser*,
  2010 WL 5776401 (D. Ariz. Jan. 28, 2010) ........................................................ 12

*SEC v. Hasho*,
  784 F. Supp. 1059 (S.D.N.Y. 1992) .................................................................... 19

*SEC v. Merch. Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ............................................................................ 23

*SEC v. Phan*,
  500 F.3d 895 (9th Cir. 2007) .............................................................................. 11

*SEC v. Reynolds*,
  2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) .................................................... 19

*SEC v. Trabulse*,
  526 F. Supp. 2d 1001 (N.D. Cal. 2007) .............................................................. 11

*Strigliabotti v. Franklin Res., Inc.*,
  398 F. Supp. 2d 1094 (N.D. Cal. 2005) .............................................................. 10

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................ 17

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ........................................................................... 11

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................. 16, 17, 20

**Statutes**

15 U.S.C. § 77q ("Securities Act of 1933 § 17(a)") .................................................. 2

15 U.S.C. § 78j(b) ("Exchange Act of 1934 § 10(b)") ........................................ 2, 18

15 U.S.C. § 77e ("Securities Act § 5") ...................................................................... 2

**Rules**

Federal Rule of Civil Procedure 9(b) ......................................................... 11, 12, 24, 25

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 10

Federal Rule of Civil Procedure 12(c) .................................................................. 1, 10

**Regulations**

17 C.F.R. § 240.10b-5 ("Rule 10b-5") ................................................................. 2, 15

17 C.F.R. § 230.506 ("Rule 506") ................................................................. 3, 4, 7, 8

**Other Authorities**

SEC Division of Corporation Finance, *Compliance and Disclosure
    Interpretations, Securities Act*, Question 257.08 .................................................. 4

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants Eng Taing ("Taing") and Touzi Capital, LLC ("Touzi Capital") (together "Defendants") move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), because the Securities and Exchange Commission's ("SEC") allegations that Defendants made materially false and misleading statements to investors in the Private Equity Consumer Credit funds ("PECC Funds") and bitcoin mining funds ("BTC Funds") fail as a matter of law.

The SEC alleges that Defendants defrauded more than a thousand investors in connection with ten unregistered securities offerings between late 2020 and early 2023. Nothing could be further from the truth. Defendants did not commit fraud. In fact, the Complaint concedes that Defendants did what they said they would: paid the investor proceeds that they raised to their business counterparties, secured contracts with third parties that required them to make a stream of payments to the PECC Funds, purchased bitcoin mining equipment, and contracted with third parties to perform mining and hosting services to generate revenue for the BTC Funds.

Unfortunately, Defendants' investment strategies did not pan out—as the SEC alleges, the PECC and BTC counterparties breached their contractual obligations to Defendants and energy prices increased while bitcoin prices decreased. The fact that the third parties breached their contractual obligations to Defendants and the businesses failed to deliver the revenue Defendants reasonably anticipated at the time Defendants sold the alleged securities is not sufficient to state a fraud claim. To adequately allege securities fraud, the SEC must plead with particularity that Defendants made material misstatements or omissions in the offer or sale of securities (among other factors). The Complaint utterly fails to do so. Instead, the Complaint pleads "fraud" by hindsight, pointing to the subsequent performance of Defendants' businesses and suggesting that Defendants' failure to

turn a profit is evidence of fraud.  It is not.  And, with respect to over half of Defendants' offerings (the BTC Funds), the Complaint relies on cherry-picked "misstatements" drawn from one-off conversations with investors, presentations, and webinars, while ignoring the detailed Private Placement Memoranda ("PPMs") and the many risk disclosures contained therein.

## II.    FACTUAL BACKGROUND

On November 20, 2024, the SEC filed its Complaint against Defendants alleging three causes of action: (1) fraud in connection with the purchase and sale of securities under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (2) fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act; and (3) the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act.  Compl. ¶¶ 247–259.  Defendants deny that they engaged in any wrongdoing or violations of the federal securities laws.[1]

### A.    The PECC Allegations.

#### 1.    Defendants Acquired Debt Rehabilitation Revenue Streams, as Defendants Told Investors They Would.

The SEC alleges that in or around December 2020, Defendants began raising money for the distressed debt business through the PECC Funds.  Doc. No. 1 ("Compl.") ¶ 47.[2]  Pursuant to Defendants' investment strategy, after receiving investor capital, the PECC Funds would invest fund assets in PECC Corp. ("PECC"), an operating company controlled by Defendants.  *Id.*  PECC then used the investor proceeds to purchase "receivables," defined as certain payment obligations under consumer contracts, from businesses that provided legal services

---

[1] Defendants also deny that they violated Section 5 of the Securities Act by engaging in the unregistered offering and sale of securities because the PECC and BTC offerings were exempt from registration, though Defendants are not moving for judgement on the pleadings as to the SEC's Section 5 allegations.

[2] Citations to the Complaint are styled as "Compl. ¶ __."  All citations to "Ex. __" refer to the exhibits attached to the Declaration of Kenneth P. Herzinger, dated January 16, 2026.

to consumers in exchange for a monthly fee, which were designed to reduce the debt that the consumers owed. Compl. ¶¶ 47–48. Specifically, PECC used the investor proceeds to acquire the accounts of persons with significant amounts of debt, some or all of which could be invalidated through legal processes conducted by Litigation Practice Group ("LPG"), a law firm working on debt rehabilitation. Compl. ¶ 83. The receivables PECC acquired were the stream of payments that LPG's clients were supposed to pay for debt rehabilitation services, which LPG would pay to an entity called Validation Partners LLC ("Validation Partners"), who would in turn pay PECC. Compl. ¶ 49. PECC typically acquired the accounts for $2,000 apiece and received $8,000 in program fees paid by the debtors over the course of 24 to 36 months. *Id.*

### 2. PECC Paid All the Funds It Raised to Business Counterparties, as It Said It Would.

The SEC alleges that between December 2020 and March 2023, Defendants raised over $22 million through the PECC Funds via three securities offerings of limited liability company ("LLC") membership interests (also called LLC units) and one offering of promissory notes ("the PECC Notes"). Compl. ¶¶ 50–51, 54, 76. Despite the SEC's fraud allegations, the SEC admits that PECC paid ***all*** the funds it raised from PECC investors—$22,962,250 to be exact—to its business counterparties for the purchase of debtor files. Compl. ¶ 91. The four alleged PECC offerings were as follows:

1. "PECC Fund I LLC" allegedly raised approximately $6.23 million through a securities offering from December 2020 through August 2022. Compl. ¶ 57. On August 18, 2021, PECC Fund I LLC filed an SEC Form D, *Notice of Exempt Offering* ("Form D"). Compl. ¶ 60. The Form D indicates that the offering was exempt from registration under SEC Rule 506(b) and the first sale was on August 5, 2021. *Id.*[3]

---

[3] *See* Ex. 1.

2. "PECC Fund II" allegedly raised approximately $3.88 million through a securities offering from March 2021 through August 2022.  Compl. ¶ 62. The SEC alleges that no Form D was filed for the PECC Fund II offering. Compl. ¶ 67.[4]

3. "PECC Fund III" allegedly raised approximately $4.61 million through a securities offering from April 2021 to November 2022. Compl. ¶ 69.  The SEC alleges that no Form D was filed for the PECC Fund III offering. Compl. ¶ 72.

4. The SEC alleges that from "December 2020 to March 2023, Touzi Capital entities received over $8.14 million in what appear to be investor funds related to PECC Funds or PECC Notes based on notes on the check or wire, the name of the account into which the funds were deposited, or other evidence."  Compl. ¶ 75.

### 3. Subsequent Unforeseen Events Detrimentally Impacted Defendants' Debt Rehabilitation Business.

The Complaint claims that Defendants first began to experience difficulties with the PECC Funds in July 2022—roughly two years after the SEC alleges that Defendants began selling securities in the PECC Funds and allegedly made misrepresentations to investors.  Compl. ¶ 93.  Specifically, the SEC alleges that in July 2022 Validation Partners alerted PECC that it would stop making distributions to PECC.  Compl. ¶ 87.  The SEC also alleges that on some unspecified date, LPG began falling behind on its payments.  Compl. ¶ 88.  Ultimately, on March 20, 2023, LPG filed for bankruptcy.  Compl. ¶ 91.  In or around April 2023, PECC ceased making the monthly payments to investors in the PECC Funds and Note investors and ceased honoring liquidation requests.  Compl. ¶ 92.  The Complaint

---

[4] "Filing a Form D is not a condition that must be met to qualify for the Rule 506 exemption."  *See* SEC Division of Corporation Finance, *Compliance and Disclosure Interpretations, Securities Act Rules*, Question 257.08 (updated Sept. 20, 2017).

1  alleges that in May 2023 Taing informed investors the PECC Funds had been
2  experiencing payment problems.  Compl. ¶ 93.  On September 14, 2023, PECC
3  filed a Proof of Claim in the LPG bankruptcy to assert a secured claim.[5]  *In re Litig.*
4  *Prac. Grp., PC*, No. 8:23-bk-10571-SC, Claim 740 (Bankr. C.D. Cal. Sept. 15,
5  2023).  Notably, the SEC does not allege that Defendants failed to use PECC
6  investor funds for the purpose they said they would nor that the debt rehabilitation
7  business had failed to make payments to PECC Fund investors or provide them
8  with a capital return on their investments before these events transpired—because it
9  cannot.[6]

10                      **4.      The Alleged PECC Misstatements and Omissions.**

11         The SEC alleges that Defendants made misstatements to PECC investors
12  concerning the stability and predictability of the PECC Funds and that the funds
13  could be treated as "an alternative to a high-yield savings account,"[7] Compl. ¶ 78;
14  that Taing told one investor by email that the PECC Fund III would have
15  "predictable monthly cash flow and liquidity," Compl. ¶ 79; and that "Defendants
16  marketed the PECC Notes . . . as [a taxable] alternative to the PECC Funds and
17  claiming that the only difference was that the Notes were taxable and thus better
18  suited for investors with a tax-advantaged IRA," Compl. ¶ 81.  The SEC alleges
19  that these statements were materially false and misleading because Defendants

20  _____
    [5] Through other litigation, it has come to light that LPG defrauded PECC by selling
21  it the same accounts receivable it sold to others, causing PECC's investors to lose
    tens of millions of dollars.  *In re Litig. Prac. Grp., PC*, No. 8:23-bk-10571-SC.
22  [6] The SEC criticizes Defendants because PECC paid $22,962,250 for the
23  purchase of debtor files but only received $14,342,508 in revenue, for a net loss of
    $8,619,742.  Compl. ¶ 91.  But Sections 10(b) and 17(a) are anti-fraud provisions,
24  not a guarantee against all investment losses.
25  [7] These partial quotations are misleading.  These statements are contained in a
    PECC Fund III presentation on a slide entitled "How Investors Have Used It" that
26  states: "The PECC fund is a very stable and predictable investment and due to its
27  high liquid nature, a number of our investors treat it as an alternative [sic] a high
    yield savings account where interest rates are typically less than .5% annually."  Ex.
28  9 at 193.

failed to disclose a series of potential risks, *see* Comp. ¶¶ 83–84, and that these risks began to materialize in July 2022, when Validation Partners alerted PECC that it would stop making distributions to PECC, Compl. ¶ 87.

### B. The BTC Allegations.

#### 1. Defendants' Created a Crypto Asset Mining Business, as They Said They Would.

The SEC alleges that Defendants offered investors the opportunity to invest in funds that would be used to invest in different operating entities engaged in the business of crypto asset mining, which were supposed to acquire mining equipment and pay returns based on the performance of those miners.  Compl. ¶¶ 135, 138, 140.  The SEC alleges that Defendants represented to investors that they would seek to profitably mine bitcoin through low-cost, fixed term energy contracts and by using high quality mining equipment, provided the price of bitcoin stayed above $10,000.  Compl. ¶ 4.

#### 2. Funds Raised from the BTC Offerings Were Used for Bitcoin Mining, as Defendants Said They Would Be.

The SEC alleges Defendants raised approximately $94 million from investors for the BTC Funds.  Compl. ¶ 136.  The SEC's Complaint alleges that Defendants raised money from investors to mine bitcoin and other crypto assets through six BTC Fund offerings of LLC membership interests (or LLC units).  Compl. ¶¶ 135, 138, 172.  Despite the SEC's fraud allegations, the SEC admits that the "funds raised from investors in the Touzi BTC Funds were used for bitcoin mining."  Compl. ¶ 204.  The six alleged PEEC offerings were as follows:

1. **BTC Fund I** allegedly raised approximately $3.47 million through a securities offering from March 2021 through September 2021.  Compl. ¶ 142.  On May 20, 2021, Teracel Blockchain Fund, LLC filed a Form D.  Compl. ¶ 145.  The Form D indicates that the offering was exempt from registration

under SEC Rule 506(b).  *Id.*[8]  The SEC alleges an investor presentation for BTC Fund I states that investor funds would be used to acquire mining equipment in March 2021 and begin mining in the second quarter of 2021 at a facility in Kearney, Nebraska.  Compl. ¶ 143.

2. **BTC Fund II** allegedly raised approximately $3.25 million through a securities offering from June 2021 through September 2021.  Compl. ¶ 147.  On August 18, 2021, Teracel Blockchain Fund II, LLC filed a Form D.  Compl. ¶ 150.  The Form D indicates that the offering was exempt from registration under SEC Rule 506(b).  *Id.*[9]  The SEC alleges an investor presentation for BTC Fund II states that investor funds would be used to acquire 500 miners in June 2021 and be setup by September 2021 at facilities in Kearney, Nebraska, and Big Springs, Texas.  Compl. ¶ 148.

3. **BTC Fund III** allegedly raised approximately $11.79 million through two securities offerings from April 2021 to March 2022.  Compl. ¶ 152.  On August 8, 2021, Touzi Data Technology, LLC filed a Form D.  Compl. ¶ 154.  The Form D indicates that the offering was exempt from registration under SEC Rule 506(b).  *Id.*[10]  The SEC alleges an investor presentation for BTC Fund III states that it would acquire 1,000 miners in August 2021 that would be setup by December 2021 at facilities in Pueblo, Colorado.  Compl. ¶ 153.

4. **BTC Fund IV** allegedly raised approximately $32.89 million through a securities offering from November 2021 through June 2022.  Compl. ¶ 158.  On July 15, 2022, Touzi Mining Invest II, LLC filed a Form D.  Compl. ¶ 161.[11]  The Form D indicates that the offering was exempt from registration under SEC Rule 506(c).  Compl. ¶ 161.  The SEC alleges that none of the

---

[8] *See* Ex. 2.
[9] *See* Ex. 3.
[10] *See* Ex.4.
[11] *See* Ex. 5.

other offering entities in BTC Fund IV filed a Form D.  Compl. ¶ 161.  The SEC alleges an investor presentation for BTC Fund III states that it would acquire miners in February 2022 and begin mining by May 2022 at facilities in Sandusky, Ohio.  Compl. ¶ 159.

5. **BTC Fund V** allegedly raised approximately $15.14 million through a securities offering from March 2022 to June 2022.  Compl. ¶ 163.  The SEC alleges that none of the three offering entities in BTC Fund V filed a Form D. Compl. ¶¶ 165–166.  The SEC alleges that the PPMs for BTC Fund V stated that Touzi Data Center LLC would use the funds raised "to acquire and lease the data center rack space and bitcoin mining equipment to bitcoin miners at the Company's new plant in Sandusky, Ohio."  Compl. ¶ 164.

6. **BTC Fund VI** allegedly raised approximately $9.41 million through a securities offering from August 2022 to October 2022.  Compl. ¶ 168.  The SEC alleges Touzi Gem Inv, LLC did not file a Form D.  Compl. ¶ 171. However, the SEC's EDGAR database shows that Touzi Gem Inv, LLC did file a Form D on December 19, 2022.[12]  The Form D indicates that the offering was exempt from registration under SEC Rule 506(b).  *Id*.  The SEC alleges that an investor presentation for BTC Fund VI states that it was acquiring discounted mining equipment that was already installed and therefore mining could start immediately after the fund closed in September 2022 at facilities in North Dakota, Texas, and North Carolina.  Compl. ¶ 169.

### 3. Subsequent Unforeseen Events Detrimentally Impacted Defendants' Bitcoin Mining Business.

The BTC Funds faced several setbacks that were beyond the control of Defendants.  From February 2021 to October 2022, Defendants executed at least six different energy contracts with five different providers.  Compl. ¶ 187.  Defendants also executed contracts with several bitcoin miners.  Compl. ¶¶ 191, 193.  The SEC

---

[12] *See* Ex. 6.

acknowledges that "[b]ank records show that Defendants spent substantial amounts to purchase or host bitcoin mining machinery." Compl. ¶ 208. However, as the SEC further acknowledges, these third-party bitcoin miners breached their contractual obligations to Defendants. Compl. ¶ 191. For example, Touzi Capital executed a contract with Bitmain for 1,000 Antminer S19 machines, but Bitmain only delivered 334 working machines to Defendants and over 600 machines were unusable "junk miners." *Id*. Similarly, Touzi Capital purchased $42 million worth of miners and hosting services from Compass Mining, Compute North, and Elite Mining, but the companies all subsequently filed for bankruptcy or went out of business, and the miners Touzi Capital purchased were either inactive or unrecoverable. Compl. ¶ 193. Notably, the SEC has not alleged when any of these events occurred. Defendants' bitcoin mining business also suffered setbacks due to unforeseen market conditions after the first BTC Fund offerings commenced in March 2021: a drop in the market price of bitcoin and an increase in energy prices. Compl. ¶ 193.

Simply put, the BTC Funds did not perform as expected due to breaches by Defendants' business counterparties and changing market conditions. The SEC has not adequately alleged that Defendants made material misstatements or omissions with respect to these risks *at the time they launched the BTC Funds*.

### 4.    The Alleged BTC Misrepresentations.

The SEC alleges that Defendants made misstatements to BTC Fund investors concerning Defendants' access to fixed low-cost energy contracts, Compl. ¶¶ 175–180; Defendants' "current cost" to mine bitcoin and profitability or "breakeven point" of mining bitcoin, *id.*; that Defendants "had secured '1000 Bitmain Antminer S19J Pros' that would be installed and setup by December 2021," Compl. ¶ 191; and "Touzi Capital has launched 3 previous Bitcoin Mining funds and consistently exceeded projections," Compl. ¶ 192. The SEC alleges that these statements were

1  materially false and misleading because Defendants failed to disclose a series of

2  potential risks.  *See* Compl. ¶¶ 182–184, 187, 191, 195.

### III.  LEGAL STANDARD

4      Defendants move to dismiss with prejudice[13] the SEC's Section 10(b) and

5  Section 17(a) allegations under Federal Rule of Civil Procedure 12(c).  The analysis

6  for a motion for judgment on the pleadings is "functionally identical" to the

7  analysis under Rule 12(b)(6).  *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192

8  (9th Cir. 1989).  To survive a 12(b)(6) motion, the plaintiff must plead "factual

9  content that allows the court to draw the reasonable inference that the defendant is

10  liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11  "Threadbare recitals of the elements of a cause of action, supported by mere

12  conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550

13  U.S. 544, 555 (2007)).  Moreover, courts do not "accept as true allegations that are

14  merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In

15  re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

16      Though Rule 12(c) does not explicitly state that a party may move for partial

17  judgment on the pleadings, it is common to apply Rule 12(c) to individual causes of

18  action and move for partial judgment on the pleadings.  *Strigliabotti v. Franklin

19  Res., Inc.*, 398 F. Supp. 2d 1094, 1097 (N.D. Cal. 2005).  A motion for judgment on

20  the pleadings is properly brought "[a]fter the pleadings are closed—but early

21  enough not to delay trial."  Fed. R. Civ. P. 12(c); *see also Dworkin*, 867 F.2d at

22  1192 (noting "[t]he principal difference between motions filed pursuant to Rule

23  12(b) and Rule 12(c) is the time of filing").[14]

24

---

25  [13] Per the Court's Scheduling Order, Doc. No. 39, the deadline to amend the

26  pleadings was July 2, 2025.  As this deadline has long since passed, the SEC's
   Complaint should be dismissed with prejudice.

27  [14] The pleadings are now closed because the deadline for the SEC to amend the

28  Complaint was July 2, 2025, and Defendants' Rule 12(c) motion will not delay trial
   because trial is not set to commence until January 25, 2027.

1    Under Rule 9(b), claims alleging fraud are subject to a heightened pleading
2  requirement, which requires that a party "state with particularity the circumstances
3  constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Averments of fraud must be
4  accompanied by the ***who, what, when, where, and how*** of the misconduct
5  charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal
6  quotation marks omitted) (emphasis added). The context surrounding the fraud
7  must "be specific enough to give defendants notice of the particular misconduct . . .
8  so that they can defend against the charge and not just deny that they have done
9  anything wrong." *Id.* (internal quotation marks omitted). The allegations "must set
10  forth *more* than the neutral facts necessary to identify the transaction. The plaintiff
11  must set forth what is false or misleading about a statement, and why it is false."
12  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal
13  quotation marks omitted).

14  ## IV.   ARGUMENT

15    To state a claim for securities fraud under Section 10(b) and Section 17(a),
16  the SEC must plead facts showing: "(1) a material misstatement or omission (2) in
17  connection with the offer or sale of a security (3) by means of interstate
18  commerce." *SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007). Claims for
19  violation of Section 10(b) and Section 17(a) "require that the SEC plead much of
20  the same elements," except claims based on a violation of Section 17(a)(1) and
21  Section 10(b) also require sufficient allegations to show scienter, while claims for
22  violation of Section 17(a)(2) and (3) require a showing of negligence. *SEC v.*
23  *Trabulse*, 526 F. Supp. 2d 1001, 1004 (N.D. Cal. 2007).

24    The SEC's claims fail because none of the statements at issue are adequately
25  alleged to be materially false or misleading and are not actionable as a matter of
26  law.

27  ### A.   The Complaint Fails to Allege an Actionable PECC Misstatement
28  ### or Omission.

The Complaint is replete with vague allegations of fraud, unsupported by the "who, what, when, where, and how" required by Rule 9(b) as to each alleged PECC securities offering. *See SEC v. Francisco*, 262 F. Supp. 3d 985, 989–90 (C.D. Cal. 2017) (dismissing SEC complaint as "vague" and lacking facts for "each particular offering"); *SEC v. Fraser*, 2010 WL 5776401, at *9 (D. Ariz. Jan. 28, 2010) (the SEC cannot allege fraud using shotgun pleadings—*i.e.*, those "that 'incorporate' all or nearly all 'antecedent allegation[s] by reference [to] each subsequent claim for relief'") (citation omitted). For example, the Complaint alleges that "*[i]n marketing the PECC Funds*," Defendants stated that the PECC funds were "very stable and predictable" and that due to their "highly liquid nature" could be treated as "an alternative to a high-yield savings account." Compl. ¶ 78 (emphasis added). But the Complaint does not allege what offering documents contained those statements, to whom they were made, in which of the three PECC Fund offerings they were made, or when Defendants allegedly made the statements. With respect to the PECC Notes offering, all the Complaint alleges is that "Defendants marketed [them] similarly." Compl. ¶ 81. Therefore, the SEC's PECC Fund and Notes claims should be dismissed with prejudice.

## 1. The Complaint Alleges Generalized Statements of Corporate Optimism, Puffery, and Opinions, Which Are Not Actionable.

"In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (internal quotation marks and citations omitted). Similarly, statements that are mere "puffery" are non-actionable as securities fraud. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Puffery comprises generalized, vague, nonquantifiable statements of corporate

1    optimism.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension*

2    *Fund*, 575 U.S. 175, 183–84 (2015) (differentiating between "mere puffery" and

3    "determinate, verifiable statement[s]" about a company's products).

4        "To be misleading, a statement must be 'capable of objective verification.'"

5    *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,

6    845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Or. Pub. Emps. Ret. Fund v. Apollo*

7    *Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)); *see also In re Mellanox Techs. Ltd.*

8    *Sec. Litig.*, 2014 WL 12650991, at *7 (N.D. Cal. Mar. 31, 2014) ("Such statements

9    employ terms that are 'not measurable'" or "'capable of objective verification' and

10   'lack a standard against which a reasonable investor could expect them to be

11   pegged.'") (citations omitted).  "For example, 'puffing'—expressing an opinion

12   rather than a knowingly false statement of fact—is not misleading." *Hewlett-*

13   *Packard Co.*, 845 F.3d at 1275; *see also In re Cornerstone Propane Partners, L.P.*,

14   355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) ("Generally, such statements consist

15   of forward-looking or generalized statements of optimism that are 'not capable of

16   objective verification,' and 'lack[ ] a standard against which a reasonable investor

17   could expect them to be pegged.'") (citations omitted).

18       The SEC alleges that Defendants made general statements that the PECC

19   Funds were "very stable and predictable," that due to their "highly liquid nature"

20   they could be treated as "an alternative to a high-yield savings account," and they

21   would have "predictable monthly cash flow and liquidity."  Compl. ¶¶ 78–79.  Such

22   statements are not actionable as a matter of law because they are not "capable of

23   objective verification," *Hewlett-Packard Co.*, 845 F.3d at 1275 (internal quotation

24   marks omitted).  These challenged statements are all too vague, subjective, and

25   informal to provide a basis for a claim of securities fraud.  Nor has the SEC alleged

26   any facts showing that they were false.  The Complaint claims with respect to the

27   PECC statements should be dismissed with prejudice.

28

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS

**Corporate Optimism.** Defendants' statements in the PECC offering documents—*e.g.*, that PECC Funds were "very stable and predictable" with a "highly liquid nature," could be treated as "an alternative to a high-yield savings account," and would have "predictable monthly cash flow and liquidity" conveyed corporate optimism and are not actionable. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

**Opinions.** For statements of opinion and belief to be actionable under a theory of material misrepresentation, the SEC is required to allege specific facts establishing "both that 'the speaker did not hold the belief she professed' ***and*** that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (emphasis added). Here, the statements identified by the SEC are opinions, "since they inherently reflect the speaker's assessment of and judgment about the underlying circumstances." *Markette v. XOMA Corp.*, 2017 WL 4310759, at *4 (N.D. Cal. Sept. 28, 2017). As the Supreme Court explained in *Omnicare*, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect." 575 U.S. at 188. "[W]hether an omission makes an expression of opinion misleading always depends on context." *Id.* at 190. Investors take into account "the customs and practices of the relevant industry," "[s]o an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* Here, the SEC fails to plausibly allege that Defendant Taing did not hold the optimistic beliefs he professed, or that these beliefs are objectively untrue. For example, the Complaint does not adequately plead that Defendant Taing's statements that PECC Funds were "very stable and predictable" with a "highly liquid nature," could be treated as "an alternative to a high-yield savings account," and would have "predictable monthly cash flow and liquidity" was necessarily objectively false or not honestly held. *See Markette*, 2017 WL 4310759, at *5 (citing *Dearborn*

*Heights*, 856 F.3d at 616); *see also Omnicare*, 575 U.S. at 186 (characterizing the inquiry as focused on whether the speaker's opinion was "honestly held").

### 2.    There Is No Rule of Completeness or Duty to Disclose and the Complaint Fails to Plead an Actionable Omission.

**No Rule of Completeness.**  The SEC faults Defendants for not adequately disclosing a laundry list of hypothetical risks regarding its debt rehabilitation intermediaries to PECC investors.  But the Ninth Circuit has expressly declined to require a "rule of completeness" for securities disclosures "because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not."  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1061 (alteration and internal quotation marks omitted) (declining to find "factually accurate" report on company's growth misleading even where it allegedly "fail[ed] to disclose 'known trends'" impacting growth because "Rule 10b-5 prohibits *only* misleading and untrue statements, not statements that are incomplete" (internal quotation marks omitted)).  The lack of any "rule of completeness" precludes the SEC's claims here.

**No Ongoing Duty to Disclose.**  Section 10(b) does not "create an affirmative duty to disclose any and all material information."  *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *12 (S.D.N.Y. May 19, 2025) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  Disclosure is not required "simply because it may be relevant or of interest to a reasonable investor"; it is only required when "necessary to make . . . statements . . . not misleading."  *Id.* (first quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); second quoting *Matrixx Initiatives*, 563 U.S. at 44).  Accordingly, Defendants were not required to disclose their evolving alleged internal observations regarding the difficulties they were having with their debt rehabilitation intermediaries.  The standard is whether Defendants, when offering or selling securities, disclosed material facts known to them.  As the Ninth Circuit has explained, "companies do not have an obligation to

offer an instantaneous update of every internal development." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022). The SEC's allegation that Defendants were required to disclose their internal assessments of the difficulties of their ever-changing negotiations with their debt service intermediaries do not state a cognizable claim because they would impose precisely the sort of nearly continuous disclosure obligation that the Ninth Circuit has rejected.

**The Complaint Fails to Plead an Actionable Omission.** Nearly all of the challenged statements are alleged to be misleading by way of omission. But for a statement to be misleading by omission, it must "*affirmatively* create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added); *Police Ret. Sys. of St. Louis*, 759 F.3d at 1061. "[I]t is not enough to allege that [a] statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement affirmatively led the plaintiff in a wrong direction (rather than merely omitted to discuss certain matters)." *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal. 2013) (emphasis and internal quotation marks omitted). The SEC has not alleged facts showing that the Defendants' statements were false or misleading.

### 3. Impermissible Fraud by Hindsight.

The SEC alleges that Defendants violated Sections 10(b) and Section 17(a) because they failed to warn investors of events that did not occur until ***after*** the date of the alleged securities offerings. Section 10(b) and Section 17(a) violations "premised on misstatements" must allege the "misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Because "[f]alsity is a failure to be truthful" and "not a misapprehension, misunderstanding, or mistake of fact," "[a] statement believed to be true when made, but later shown to be false, is insufficient." *Id.* (citations omitted).

1    "For a statement to be false or misleading, it must 'directly contradict what

2    the defendant knew at that time' or 'omit[] material information.'" *Weston Fam.*

3    *P'ship*, 29 F.4th at 619 (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

4    988, 1008–09 (9th Cir. 2018)).  Thus, to prevail on these allegations, the SEC must

5    allege that the risks had materialized at the time of the offerings.  *Id.* at 622 (no

6    falsity where "[p]laintiffs ha[d] not adequately alleged that [defendants] even knew

7    about these [adverse facts] when" they made the challenged statements); *Veal v.*

8    *LendingClub Corp.*, 423 F. Supp. 3d 785, 809 (N.D. Cal. 2019) (dismissing on

9    falsity grounds where plaintiff did not allege risk had materialized at the time the

10   statements were made and that defendants were aware of such materialization).

11       The Complaint acknowledges that Defendants first began experiencing

12   difficulties with their PECC businesses in or around July 2022.  Compl. ¶ 93.  But

13   most of Defendants' PECC offerings occurred prior to July 2022.  *See* Compl.

14   ¶¶ 57, 62, 69, 75.  The most the SEC can allege is fraud by hindsight, and that is not

15   sufficient to state a claim.

16       **B.    The Complaint Fails to Allege an Actionable BTC Misstatement.**

17       The Complaint falls woefully short in pleading with particularly that

18   Defendants committed fraud in their offer or sale of securities as to BTC Funds I,

19   II, III, IV, and VI (and pleads no allegations whatsoever as to BTC Fund V, which

20   is grounds for dismissal).

21       For BTC Funds I II, III, IV, and VI, the SEC points to "presentations"

22   containing allegedly fraudulent statements, Compl. ¶¶ 175–179, but provides none

23   of the particularity of the circumstances, such as when these presentations were

24   made, to whom they were made available, or any other context.  The same is true

25   for the webinar cited as to BTC Fund VI and the email cited as to BTC Fund III.

26   Compl. ¶¶ 177–179.  The Complaint cites alleged statements in marketing materials

27   for BTC Fund III (Compl. ¶ 191) and for BTC Fund IV (Compl. ¶ 192), but

28   importantly fails to allege what offering documents contained those statements,

when such statements were allegedly made, or to whom such statements were allegedly made.  Finally, the Complaint alleges statements were made generally to "numerous investors," Compl. ¶ 180, but the allegations lack any of the required specificity as to what documents contained the alleged statements or when the statements were allegedly made.  Combining these vague allegations compounds the problem; it does not cure the SEC's failure to plead with particularity.  *See Francisco*, 262 F. Supp. 3d at 989–90.  All claims regarding the BTC Funds should be dismissed with prejudice.

The SEC fails to adequately allege that these statements, most of which are made in presentations, email, and non-public conversations, were made "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), or that these statements were made in the context of detailed information and risk disclosures contained in PPMs (which the SEC inexplicably fails to attach to the Complaint).

### 1.    Inactionable Opinion/Forward-Looking Statement/Forecast.

Taing's opinions and forward-looking statements regarding his BTC formula and breakeven calculations, as well as the bitcoin mining and energy contracts entered into by Defendants, cannot support the SEC's claims, because the Complaint fails to allege that Taing did not reasonably believe his statements or that they were objectively untrue.

**Opinion.**  To sufficiently plead an action based on a theory of material misrepresentation regarding Mr. Taing's statements of opinion and belief, the SEC must allege specific facts to establish such opinions were both not honestly held *and* objectively false.  *See* Section IV.A.1, *supra*.  The statements identified by the SEC regarding Taing's BTC formula and breakeven point calculations, which are manifestations of Taing's assessment and judgment regarding the BTC Fund operations, are opinions.  *See Markette*, 2017 WL 4310759, at *4.  While the SEC attempts to allege the BTC formula and breakeven point calculations were

methodologically flawed, the Complaint lacks the required allegations that Taing did not honestly believe in the accuracy of his formula and statements he made on the subject, or that they were objectively false when made. *See, e.g., id.* at *5; *Dearborn Heights*, 856 F.3d at 615–16; *Omnicare*, 575 U.S. at 186. As a result, the SEC has failed to plead material misrepresentation as to Taing's statements on the BTC formula and breakeven point calculations.

The same can be said of Taing's optimistic opinions regarding the contracts executed by Defendants for bitcoin mining machines and energy costs. Again, Taing's statements regarding these contracts reflect his assessment and judgment, and are thus opinions. And again, the SEC fails to plead that Taing's opinions and beliefs that Touzi would be able to "profitably mine through low-cost, fixed term energy contracts and by using high quality mining equipment," Compl. ¶ 4, were not honestly held or objectively false at the time.

**Forward-Looking Statement/Forecast.** "Projections of future performance generally are not actionable . . . , unless they are false when made." *SEC v. Reynolds*, 2008 WL 3850550, at *4–5 (N.D. Tex. Aug. 19, 2008); *see also SEC v. Hasho*, 784 F. Supp. 1059, 1109 (S.D.N.Y. 1992). So, the SEC must plead that Taing lacked a reasonable, good faith belief in his BTC formula and breakeven point calculations at the time he made them. The SEC did not, and cannot, do so. Fatally, the SEC fails to identify any facts that Taing "knew," ***as of the date of each BTC offering***, would ***in the future*** fail to achieve the profits he projected. *Reynolds*, 2008 WL 3850550, at *4–5. The only allegations of falsity in the Complaint are that an unnamed employee disagreed with Taing's BTC formula and the projections did not turn out as predicted. That is insufficient to plead a claim.

## 2.    The SEC Cannot State a Claim by Relying on Fraud by Hindsight.

As discussed in Section IV.A.3, *supra*, violations premised on misstatements require that a defendant's statement was false at the time it was made and the

1  defendant knew it was false.  *See, e.g.*, *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571;
2  *Weston Fam. P'ship*, 29 F.4th at 619, 622.  The SEC cannot show this to be the
3  case where Defendants took actions exactly as promised to investors with the full
4  belief that contracted third parties, and the market, would operate as reasonably
5  expected.  Moreover, Defendants statements—such as the SEC's allegation that
6  Defendants' "current cost" to mine bitcoin and $10,000 "breakeven point" of
7  mining bitcoin profitably (Compl. ¶¶ 175–180)—cannot reasonably be interpreted
8  as a promise or guarantee that it would remain the same forever.

9       The SEC's own allegations show that Defendants represented to investors
10  that they would seek to profitably mine bitcoin through low-cost, fixed term energy
11  contracts and by using high quality mining equipment, provided the price of bitcoin
12  stayed above roughly $10,000.  Compl. ¶ 4.  Consistent with their representations to
13  investors, Defendants took actions to establish low-cost, fixed term energy
14  contracts and the procurement and use of high-quality mining equipment, yet were
15  thwarted by outside factors.  From February 2021 to October 2022, Defendants
16  entered into at least six energy contracts with five different providers.  Compl. ¶
17  187.  Defendants also executed contracts with several bitcoin miners.  Compl. ¶¶
18  191, 193.  The SEC acknowledges that "[b]ank records show that Defendants spent
19  substantial amounts to purchase or host bitcoin mining machinery."  Compl. ¶ 208.

20       Unfortunately, neither Defendants' counterparties nor the market behaved as
21  reasonably expected after the BTC Fund offerings commenced, as the SEC's
22  Complaint itself shows.  For example, Touzi Capital executed a contract with
23  Bitmain for 1,000 Antminer S19 machines, but Bitmain only delivered 334 working
24  machines to Defendants; over 600 machines were unusable "junk miners."  Compl.
25  ¶ 191.  Similarly, Touzi Capital purchased $42 million worth of miners and hosting
26  services from Compass Mining, Compute North, and Elite Mining, but the
27  companies all subsequently filed for bankruptcy or went out of business, and the
28  miners Touzi Capital purchased were either inactive or unrecoverable.  Compl.

¶ 193.  Defendants' bitcoin mining business also suffered setbacks due to unforeseen changes in market conditions.  Specifically, the market price of bitcoin dropped precipitously and energy prices increased after the first BTC Fund offerings commenced in March 2021.  Compl. ¶ 194.  Defendants had no cause to reasonably believe such compounded bad luck would occur.  Bad luck—or even bad business—is not sufficient to state a claim for securities fraud.  Because the SEC failed to allege that Defendants made knowingly false statements regarding Bitcoin Fund energy contracts or mining machinery, the Court should enter judgment on the pleadings in favor of Defendants.

### 3. Defendants Disclosed BTC Risks in Private Placement Memoranda.

Defendants provided PPMs to BTC Fund investors.  The PPMs, which are incorporated by reference in the Complaint, specifically warned of the risks that the SEC asserts later came to pass, including, among several others, risks regarding:

- **Limited Operating History**: "The Company was only recently organized and has not any business activity as of the date of this Memorandum.  The lack of operating history must be considered in light of the risks and difficulties frequently encountered by new enterprises in their early stages, ***particularly cryptocurrency investment companies looking to perform in a highly competitive market***.  The lack of operating history makes the prediction of future results extremely difficult.  There can be no assurance that the Company will not incur significant net losses in the future or that it will achieve sufficient revenues to sustain operations or operate profitably."

- **No Guarantee of Profitability**: "The Manager anticipates that returns on the Company's investment in the Business Owner will be sufficient to create net income for distribution by the Company to the Members.  However, there can be no assurance that the Business Owner's income or the Company's income will be sufficient for such purpose.  Although the Manager believes

21

the investment strategy has economic viability and will generate sufficient positive returns, it cannot guarantee that the investment strategy will be profitable to the extent anticipated, ***if at all***."

- **No Guaranteed Return of Investor's Capital Contributions**: "Investment in the Company is speculative and involves ***a high degree of risk***. There can be no guarantee that an investor will realize a substantial return on its investment in the Units, ***or any return at all, or that the investor will not lose its entire investment***."

- "***The long-term viability of cryptocurrencies is unknown***…. Due in part to [listed] uncertainties, the price of cryptocurrencies is volatile, and cryptocurrencies may be hard to sell. ***The Company, the Manager and the Business Owner do not control any of these factors, and therefore may not be able to control the ability of any cryptocurrency to maintain its value***. The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a ***high degree of uncertainty***."

- "***Cryptocurrencies are subject to volatile price fluctuations.***… If cryptocurrency markets continue to be subject to sharp fluctuations, the Members may experience losses as the value of the Company's investment in the Business Owner and the Business Owner's investment in the Business decline."

- "***The Business requires a tremendous amount of energy and there can be no guaranty that such energy will be available at an affordable price and on a continuous basis***. The Business involves a substantial bitcoin mining business that requires a tremendous amount of energy. It is possible that such rising energy costs or the loss or interruption of energy, whether due to climate change, pandemic, increased demand, infrastructure instability, governmental regulation, or otherwise, will adversely affect the Business and, in turn, negatively impact the success of the Business and the net

1    income generated therefrom.  ***The Company's investment strategy is***

2    ***uniquely susceptible to risks relating to the energy markets***."

3    *See* Ex. 7 at 74–85 (emphases added).  The PPMs also warned potential investors

4    about risks of loss due to "general economic conditions, capital and debt markets,

5    ***the cryptocurrency industry***, the Company's investment strategy, the unlimited

6    term of the Company, ***the lack of liquidity***, restrictions on transfer and resale of the

7    Units, and the mid-term nature of an investment in the Units" and that "investment

8    returns are ***highly dependent*** on the ***difficulty of growth*** of bitcoin mining and

9    bitcoin price."  *Id.* (emphases added).

10        "[W]here a company's filings contain abundant and specific disclosures

11    regarding the risks facing the company, as opposed to terse, generic statements, the

12    investing public is on notice of these risks and cannot be heard to complain that the

13    risks were masked as mere contingencies."  *Plevy v. Haggerty*, 38 F. Supp. 2d 816,

14    832 (C.D. Cal. 1998).  Here, Defendants' risk warnings were neither "terse" nor

15    "generic," although, inexplicably, they are not acknowledged in the Complaint.  In

16    light of these disclosures, which are incorporated by reference in the Complaint, the

17    SEC has not—and cannot—allege with particularity that investors were misled into

18    thinking Defendants unequivocally promised that (1) the BTC Funds would be able

19    to mine bitcoin at a cost that would make the funds profitable in the future, (2) the

20    energy contracts the BTC Funds procured would provide the operations with

21    predictable costs indefinitely in the future, or (3) the mining equipment Defendants

22    procured would operate perfectly.  *See SEC v. Merch. Cap., LLC*, 483 F.3d 747,

23    768 (11th Cir. 2007) ("[C]autionary language . . . rendered the projections

24    immaterial as a matter of law").

25        The SEC's allegations regarding statements by Defendants in investor

26    presentations, emails, or otherwise are inactionable to the extent they contradict the

27    PPMs and other offering documents.  Investor presentations, including the ones

28    raised in the SEC's Complaint, include the following language or similar:

> An offer to invest will only be made only by means of a confidential private placement memorandum ('PPM') to be furnished to prospective qualified investors, which will contain a description of the material terms (including, without limitation, risk factors, conflicts interests, fees and expenses, and tax aspects) relating to the fund.  Prospective investors should review the PPM before deciding to invest and should only rely on the PPM to decide whether to invest.

Ex. 8 at 158.  And in order to invest, investors were required to sign a subscription agreement, part of the offering package with the PPM, that states, "This Agreement (a) constitutes the entire agreement and supersedes all prior and contemporaneous agreements, negotiations, arrangements and understandings, both written and oral, among the Parties with respect to the subject matter hereof, and (b) is not intended to confer upon any person or entity, other than the Parties, any rights or remedies." Ex. 7 at 150.  Thus, to the extent any prior oral statements, presentations, or emails contradict the PPM and other offering documents in the subscription package, the SEC cannot plausibly allege that investors relied on the outside information and were misled in their investment decision.  *See Kronk v. Landwin Grp., LLC*, 2011 WL 13143096, at *4 (C.D. Cal. June 7, 2011), *aff'd*, 517 F. App'x 605 (9th Cir. 2013).

## C.    The SEC's Commingling and Misappropriation Allegations Fail

The SEC alleges that although Defendants did use investor funds to engage in the BTC and PECC business ventures, Defendants commingled investor monies, using funds intended for one Touzi Capital entity to meet the needs of another Touzi Capital entity.  *See* Compl. ¶¶ 2, 100–01, 203–04.  The SEC alleges that, as a result, this commingling violated representations Defendants made to investors that their funds would be used for the specific business in which they invested.  Compl. ¶ 2.

The Court should dismiss the SEC's commingling allegations because the SEC has failed to comply with Rule 9(b).  *SEC v. Francisco* is instructive.  In that case, the SEC alleged that the defendants, PDC Capital and its principal Emilio

Francisco, raised approximately $72 million from investors in 19 securities offerings through multiple entities and diverted investors' funds from one project to another on multiple occasions in violation of the offering terms. *Francisco*, 262 F. Supp. 3d at 987, 988. The SEC also alleged that Francisco misappropriated at least $9.5 million to finance his luxurious lifestyle. *Id.* at 988. The court dismissed the SEC complaint because it consisted of "vague generalities" rather than the high level of detail required by Rule 9(b).

> Simply stated, the SEC has failed to comply with Rule 9(b). While the broad strokes of the alleged fraud is clear —PPMs promise allocation of money to particular projects, instead Defendant Francisco mingled funds and improperly diverted funds from projects to his personal enrichment—the Complaint does not delineate the nature of the fraud in each particular offering. Rather than describing the commonalities between offerings or the traits of some or most offerings, Rule 9(b) requires clear allegations of which statements were made with which offerings when and through which means.

*Id.* at 990. The same is true here. The SEC does not even allege that the monies transferred between Touzi Capital entities was not spent on its intended purpose.

The SEC's allegation that Taing misappropriated investor funds by using Touzi Capital funds to benefit himself fails to satisfy Rule 9(b) as well. *See* Compl. ¶¶ 227–33. Moreover, as the manager of the PECC and BTC Funds, Taing was entitled to withdraw up to 50% of the net revenue of the business after return of the company's capital contributions (some of which constituted his personal compensation). *See, e.g.*, Ex. 7 at 10. And because the SEC has failed to allege the funds' revenue and whether Taing withdrew more than 50% of the revenue after return of the company's capital contributions, the Complaint does not satisfy Rule 9(b).

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter judgment on the pleadings dismissing the SEC's Section 10(b) and Section 17(a) claims with prejudice.

1    DATED:  January 16, 2026                    PAUL HASTINGS LLP

2

3                                                By:  /s/ Kenneth P. Herzinger
                                                      KENNETH P. HERZINGER
4

5                                                *Attorneys for Defendants*
                                                ENG TAING and TOUZI CAPITAL,
6                                                LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS